# Third District Court of Appeal

## State of Florida

Opinion filed April 8, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D12-877
Lower Tribunal No. 09-635 B-K, 09-726 K
_____

**Tomas Reza,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Monroe County, David J. Audlin, Jr., Judge.

Kenneth J. Kukec, for appellant.

Pamela Jo Bondi, Attorney General, and Jeffrey R. Geldens, Assistant Attorney General, for appellee.

Before SUAREZ, LAGOA and SCALES, JJ.

SUAREZ, J.

Tomas Reza seeks to reverse a pretrial order denying his motion to suppress

two separate confessions and to set aside his conditional nolo pleas, reverse the

ensuing convictions and remand for further proceedings. We reverse and remand as to case number 2009-CF-635 for further proceedings. We affirm as to case number 2009-CF-726.

There were three robberies with assaults in Key West over a week's time. Mr. Lee was assaulted on the evening of July 8, 2009, knocked to the ground and his wallet stolen. He could only generally describe his assailants as two juvenile males on bicycles. A week later, Mr. Sullivan and Mr. Milone were similarly attacked, minutes apart, by what they both described as a group of four or five black juveniles on bicycles. All three victims were beaten and their wallets stolen while they were incapacitated on the ground.

A bystander recovered a cell phone from the site where Mr. Milone was assaulted. Police detectives used information on the phone to track down 17-year old Cornelius Jones. Officers Calvert and Leahy were sent out by the investigative unit to locate Jones and to bring him to the police department for questioning regarding the robberies. The officers went to his apartment and spoke to his mother. Although Jones was not there and she could not contact him (he had lost his cell phone the previous night), Jones's brother took them to an area where he said Jones could be found. Officer Calvert testified that Officer Leahy walked a mangrove path cut-through between two apartment complexes, and in a small open area among the trees they found Jones with another person. When the police officer asked Jones where he was the previous night, he declined to answer and

2

declined to voluntarily come in for questioning. Officer Leahy handcuffed Jones. The officer turned to the other person who was with Jones, Tomas Reza, a 16-year-old Hispanic male. Neither officer knew him, or had any instructions regarding him. They nevertheless questioned Reza about who he was and where he had been the night before. Officer Calvert testified that Reza appeared very nervous, refused to answer questions about where he had been the previous night, and also refused to voluntarily come with them to the police station for questioning. Reza was then handcuffed and both juveniles were placed in separate squad cars and taken to the local police station. Neither Jones nor Reza resisted, and neither were read their Miranda rights.

Confession #1, Case No. 2009-CF-635. The police contacted Reza's mother and she met them at the station. In the interview room and with his mother present,[1] Reza was read his Miranda rights and he signed the Miranda waiver form. He was not handcuffed at that time. Upon questioning by Detective Haley, he made statements that indicated he participated in the Sullivan and Milone attacks. He implicated Jones as well. Immediately after the interrogation, Reza was booked on charges based on the Sullivan and Milone muggings. The time between

---

[1] The record indicates that Reza's mother spoke no English, was not given the opportunity to speak with her son alone prior to the interrogation, and the interrogation was conducted in English. One of the detectives present at the interrogation supplied Mrs. Reza with an interpretation of the questions and answers.

3

Reza's arrest and the beginning of the interview was approximately forty-five minutes.

Confession #2, 2009-CF-726. Two weeks later, while incarcerated in the juvenile detention facility, Reza was interviewed by the detectives regarding the first victim, Mr. Lee. During this interview, Reza was read his Miranda rights and admitted that he and Jones had assaulted and robbed Mr. Lee. Based on these statements, Reza was additionally charged with Lee's robbery as well. The two cases[2] were transferred to adult court, as Reza had turned 17. Reza sought to suppress his statements in both cases;[3] the record indicates that both parties agreed the motion was dispositive. After a suppression hearing the trial court summarily denied the motion to suppress. It appears from the record that by the time the motion to suppress was filed on behalf of Reza and co-defendant Jones, Reza's two cases had been consolidated. Thus, the order denying the motion to suppress does not distinguish between Reza's first and second confessions or between Reza and co-defendant Jones. Reza eventually pled *nolo contendere* on all three counts (robbery, battery on a person over 65 [victim Sullivan], aggravated battery [victim Milone], robbery [victim Lee]), expressly reserving the right to appeal denial of the motion to suppress. We defer to the trial court's factual findings but review the

---

[2] Counts 1 and 2 based on Sullivan and Milone muggings, case no. 2009-CF-635, and Count 3 stemming from the Lee mugging, case no. 2009-CF-726, were consolidated under case no. 2009-CK-635.

[3] The motion to suppress was jointly filed by both Reza and Jones. The Order denying the motion to suppress applies to both defendants.

legal conclusions *de novo*.  Gray v. State, 981 So. 2d 562, 564 (Fla. 4th DCA 2008).

**Confession #1, Case No. 2009-CF-635**     While the arresting police officer may have had some suspicion that Reza was being evasive in his answers and behavior, that suspicion did not approach the level necessary to establish probable cause to detain or arrest.[4]  In Popple v. State, 626 So. 2d 185, 186 (Fla. 1993), the Florida Supreme Court explained that there are essentially three levels of police-citizen encounters.  The first level is considered a consensual encounter and involves only minimal police contact.  During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them.  Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked.  United States v. Mendenhall, 446 U.S. 544 (1980).

> "When determining whether a particular encounter is consensual, the Court must look to the totality of the circumstances surrounding the encounter to decide if the police conduct would have communicated to a reasonable person that the person was free to leave or terminate

---

[4] A suspect may be detained at the direction of another police officer.  This course is valid only when the officer initiating the detention has either a founded suspicion justifying an investigatory stop or probable cause to arrest, although the officer receiving the instruction has neither. United States v. Hensley, 469 U.S. 221 (1985).  Thus, "the rule works both ways:  to validate an arrest when the responsible officers have probable cause and to vitiate it when, as here, none objectively exists." Albo v. State, 477 So. 2d 1071, 1073 (Fla. 3d DCA 1985).  As Judge Schwartz wrote in Albo:  "[J]ust as the police may permissibly act upon their collective knowledge, so they are restrained by their collective ignorance." Albo, 477 So. 2d at 1074.

the encounter." Taylor v. State, 855 So. 2d 1, 15 (Fla. 2003) (citation and quotation marks omitted). Factors to consider in determining whether a reasonable person would consider himself to be in custody under the totality of circumstances include: (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning. Caldwell v. State, 41 So. 3d 188, 198 (Fla. 2010).

Garcia v. State, 88 So. 3d 394, 401 (Fla. 4th DCA 2012).

The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable and articulable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151 Fla. Stat. (2014); Gray v. State, 981 So. 2d 562, 564–65 (Fla. 4th DCA 2008); State v. Cortez, 705 So. 2d 676, 678 (Fla. 3d DCA 1998) (quoting State v. Russell, 659 So. 2d 465, 468 (Fla. 3d DCA). In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. A mere hunch is not enough to support a stop. Popple, 626 So. 2d at 186; State v. Taylor, 826 So. 2d 399, 405 (Fla. 3d DCA 2002); Carter v. State, 454 So. 2d 739 (Fla. 2d DCA 1984).

Even if Reza's initial detention could be considered a consensual encounter, it did not meet the criteria for an investigatory stop because "[w]hether an officer's suspicion is reasonable is determined by the totality of the circumstances which existed at the time of the stop and is based solely on facts known to the officer

6

*before* the stop." Fuentes v. State, 24 So. 3d 1231, 1234 (Fla. 4th DCA 2009). In Reza's case, the officer had no prior information about Reza, did not know who Reza was when he was found with Jones, and admitted at the suppression hearing that Reza did not match the description of the perpetrators. Further, the officer could not articulate reasons for handcuffing and bringing Reza to the station other than that Reza did not look him in the eyes when he questioned him, was anxious, and refused to answer his questions. "[The] police may properly handcuff a person whom they are temporarily detaining when circumstances reasonably justify the use of such restraint." Reynolds v. State, 592 So. 2d 1082, 1085 (Fla. 1992); Saturnino–Boudet v. State, 682 So. 2d 188 (Fla. 3d DCA 1996). Circumstances that justify handcuffing include instances "where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee." Reynolds, 592 So. 2d at 1084. Such circumstances were not present here. As a result of the lack of probable cause at the time of the initial detention, the trial court should have granted Reza's motion to suppress those statements arising out of the first interrogation.

The State concedes that Reza's initial detention was an arrest without probable cause. It argues, however, that subsequent events broke the causal connection between the initial illegal arrest and Reza's inculpatory statements. E.g., Adams v. State, 830 So. 2d 911 (Fla. 3d DCA 2002) (holding that a confession obtained during custodial interrogation after an illegal arrest is

inadmissible at trial, but can be admissible as evidence where the State can prove the causal chain between the arrest and the confession is broken) (citing Brown v. Illinois, 422 U.S. 590 (1975); Roman v. State, 475 So. 2d 1228 (Fla. 1985)).  In particular, the State asserts that the circumstances of the arrest were sufficiently detached from the actual interrogation to support the use of the admissions against Reza.  The State argues that those intervening circumstances include, for example, the police encountering Reza with Jones in the mangrove cut-through area (characterizing it as a "hideout"); the police officer's conclusion that Reza was being evasive; Reza's mother's presence during the interview; the fact that Reza was not handcuffed while in the interview room; that Reza never asked to leave and was not prevented from doing so;[5] and that Reza knowingly waived his Miranda rights.  We disagree that any or all of these circumstances work to break

---

[5] Reza was not, however, told that he was free to leave once he arrived at the station.  The Court in Garcia also instructed,

> [n]or do we suggest that absent probable cause, it is improper for the police to handcuff potential suspects as they are led through the police station or to place them in locked interview rooms while the officers prepare for questioning.  We defer to law enforcement with regard to how to best ensure the safety of officers and other personnel at police stations. **Where law enforcement feels the need to use such safety precautions, however, it becomes extremely important that the police clearly explain to the citizen being questioned that he or she is not under arrest and is free to leave at any time.**

Garcia, 88 So. 3d at 402-403 (e.s.).  The record reveals the police gave no such explanation to Reza during his detention and interrogation.

the causal connection between the initial illegal detention and Reza's first inculpatory admission made less than an hour later.

Brown v. Illinois, 422 U.S. 590 (1975) holds that Miranda warnings alone do not break the causal connection between an illegal arrest and a confession. See J.P. v. State, 695 So. 2d 464 (Fla. 3d DCA 1997) (finding no causal break between illegal arrest and confession, despite giving of Miranda warnings). The Brown Court cautioned:

> Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'

422 U.S. at 602–03. In Brown, the Supreme Court provided a list of factors to consider when determining whether the taint from previous police misconduct has been broken. Those factors include whether Miranda warnings have been given, the temporal proximity of the misconduct and the confession (the more time that passes, the more likely the confession is voluntary and not in response to a show of force); the presence of intervening circumstances (e.g., acquiring additional independent evidence); and the purpose and flagrancy of the misconduct. Reza's first interrogation took place a mere forty-five minutes after his illegal detention, and there was no intervening event of significance whatsoever. Further, the impropriety of Reza's arrest was

9

obvious given the purpose of the officer's action was solely to pick up Jones for questioning. See Florida v. Royer, 460 U.S. 491, 497 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, **a burden that is not satisfied by showing a mere submission to a claim of lawful authority**.") (e.s.); Taylor v. Alabama, 457 U.S. 687 (1982) (holding the fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest); Ramirez v. State, 739 So. 2d 568, 575–76 (Fla. 1999) (stating, "[f]or a confession to be admissible as voluntary, it is required that at the time of the making the confession the mind of the defendant be free to act uninfluenced by either hope or fear").

Examining the totality of the circumstances, we conclude that the trial court erred by denying the motion to suppress Reza's initial confession. The State has properly admitted that there was no probable cause to detain or arrest Reza. There was minimal passage of time between the illegal arrest and confession; there were no intervening circumstances sufficient to disconnect the illegality of the detention from Reza's inculpatory statements during the initial interrogation. Reza was handcuffed and transported to the police station, placed un-handcuffed in an interview room, and was not told he was free to leave. Although he was Mirandized and his mother was present during the interview, this is not enough to

overcome the coercive nature of the police encounter.[6] We therefore reverse the trial court's order denying Reza's motion to suppress his initial confession in case number 2009-CF-635.

**Confession #2, Case No. 2009-CF-726** Reza's second confession admitting his participation in the Lee mugging was made about two weeks later while he was incarcerated at the Department of Juvenile Justice ("DJJ"). The investigating detectives' stated reasons for wanting to interrogate Reza in the Lee matter was the crime's similarity and proximity in time to the Milone and Sullivan offenses. Reza was brought to speak with the detectives at the detention facility. The detective turned on a digital recorder, read Reza his <u>Miranda</u> rights, and Reza agreed to speak with the detectives. Where a confession is obtained after the administration of the <u>Miranda</u> warnings, however, the State must demonstrate by a

---

[6] Current research into adolescent development suggests that youth may frequently consent to interrogation in the absence of important legal protections. Even when not under arrest, juvenile suspects being interrogated for a crime may be strikingly unaware of their constitutional rights and confess without legal counsel or even a parent present. See Hayley M. D. Cleary, <u>Police Interviewing and Interrogation of Juvenile Suspects: A Descriptive Examination of Actual Cases</u>, Law and Human Behavior, Vol. 38(3), 271-282, June 2014. An analysis of 57 videotaped juvenile interrogations at 17 police departments around the country revealed none of the suspects, who ranged in age from 13 to 17, had an attorney present while they were questioned. <u>Id.</u> Of those 57 interrogations, parents were present for only 12 interrogations. <u>Id.</u> Nearly a third of the teenagers were not actually under arrest at the time of questioning; of those, 28 percent fully confessed, another 28 percent made incriminating admissions; all of these youth had already waived their <u>Miranda</u> rights. <u>Id.</u> See also Barry C. Feld, <u>Police Interrogation Of Juveniles: An Empirical Study of Policy and Practice</u>, J. Crim. Law & Criminology, Vol. 97, No. I Northwestern University, School of Law, 2006 (asserting that immaturity and vulnerability make juveniles uniquely susceptible to police interrogation tactics).

preponderance of the evidence that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel, especially where the suspect is a juvenile. Ramirez v. State, 739 So. 2d 568, 575 (Fla. 1999). In Ramirez, the Florida Supreme Court set out certain factors that may be included in deciding whether a waiver of Miranda warnings is valid: "[1] the manner in which the Miranda rights were administered, including any cajoling or trickery; [2] the suspect's age, experience, background and intelligence; [3] the fact that the suspect's parents were not contacted and the juvenile was not given an opportunity to consult with his parents before questioning; [4] the fact that the questioning took place in the station house; and [5] the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset." Id. at 575–76. See also M.A.B. v. State, 957 So. 2d 1219, 1232 (Fla. 2d DCA 2007); compare State v. Roman, 983 So. 2d 731 (Fla. 3d DCA 2008).

Keeping the Ramirez factors in mind, the record indicates the Miranda warnings were properly administered. Although the detectives did not secure a written Miranda waiver prior to the second interrogation, this is not fatal to the waiver analysis. See Sliney v. State, 699 So. 2d 662 (Fla. 1997). The interrogating officer testified at the suppression hearing that he knew Reza's mother was present during the first interrogation, but admittedly made no effort to contact her prior to the second interrogation. Even though the failure to notify Reza's parent prior to the interrogation does not, by itself, dispose of the Miranda

12

waiver question, it is a factor relevant to the voluntariness of the waiver of rights. J.G. v. State, 883 So. 2d 915, 924 (Fla. 1st DCA 2004). Although lack of notification of a child's parents is a factor the court may consider in determining the voluntariness of any child's confession, it is not a statutory prerequisite to interrogation. Doerr v. State, 383 So. 2d 905, 908 (Fla. 1980).

Early into the second interrogation, Reza asked for his mother and became emotional about not being able to speak with her. The officers did not ask why he wanted to see his mother, and repeatedly told Reza that they could not arrange for him to see her. The State asserts that, similar to the right to remain silent, police must cease questioning only if the juvenile expressly conditions his participation on the presence of a parent. On this record, we find that Reza's statements that he wanted to see his mother were equivocal and not an invocation of his right to remain silent. See Deviney v. State, 112 So. 3d 57, 75 (Fla. 2014) ("Although recommended by this Court, police are not required to ask clarifying questions when a suspect equivocally invokes his or her right to remain silent. . . . to require the police to ask clarifying questions in the face of an ambiguous invocation of the right to remain silent would pose too great an impediment on law enforcement's efforts and ability to thwart crime and promote public safety.").

Reza argues that his second confession should have been suppressed because his counsel was not notified prior to the interrogation. He asserts that the officers interrogating Reza about the Lee mugging knew or should have known

that Reza had been appointed counsel for the charges lodged against him in the Malone and Sullivan case, but made no effort to notify counsel so that he or she could be present at Reza's second interrogation regarding the Lee matter. This was particularly important, Reza argues, where the detectives' stated reasons for wanting to interrogate Reza in the Lee matter was the crime's similarity and proximity in time to the Milone and Sullivan offenses. It is true that, if the police initiate an encounter in the absence of counsel (assuming there has been no break in custody, as here), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. Traylor v. State, 596 So. 2d 957, 978 (Fla. 1992) (citing Arizona v. Roberson, 486 U.S. 675 (1988)). In McNeil v. Wisconsin, 501 U.S. 171, (1991), however, the Court held that an accused's request for counsel at his initial appearance on a charged offense, while effective to invoke his Sixth Amendment right to counsel, did not constitute an invocation of his Miranda right to counsel that would preclude police interrogation on unrelated, uncharged offenses. McNeil, 501 U.S. at 177–78. In so holding, the Court refused to merge the Sixth Amendment right to counsel, which is offense-specific, with the non-offense-specific Miranda right to counsel during interrogation. See also, State v. Stanley, 754 So. 2d 869, 874 (Fla. 1st DCA 2000); Owen v. State, 596 So. 2d 985, 989 (Fla. 1992) (holding the right to counsel is offense-specific: attachment and

14

invocation of the right on one charge imposes no restrictions on police inquiry concerning other charges against the same defendant). We conclude that no Sixth Amendment violation occurred here.

Considering the remaining <u>Ramirez</u> factors, we find the record demonstrates that Reza's age, experience, education, background, and intelligence were such that he could read and write English, he was aware of the penalties he faced, he understood his situation and chose to voluntarily speak with the detectives about the Lee mugging. Although the juvenile detention facility is an inherently coercive environment, there is no compelling evidence of police misconduct or coercive interrogation tactics. Reza was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.[7]

We limit our decision to the suppression order as it applies to Reza (not his co-defendant), and reverse the trial court's denial of the motion to suppress Reza's

---

[7] The detectives admittedly used certain techniques of interrogation to influence Reza to talk. For example, the record indicates that a photo lineup had been presented to Mr. Lee in New Jersey, where he resided. The detective interviewing Reza testified that Mr. Lee did not identify Reza from the photo lineup but merely "hesitated" at viewing his photograph from among the lineup photos. The New Jersey officers conducting the photo lineup conveyed this information to the Key West detectives, and on this slim basis they decided to interview Reza. The officers at the interrogation, however, told Reza that Mr. Lee "broke down" when he saw Reza's photo in the photo lineup. The officer who questioned Reza testified that he "embellished" the fact that Mr. Lee did not identify Reza at all. Further, the officers suggested to Reza that if he was at the crime scene, his DNA could be found and used against him. But there was no such evidence. The interrogating detective admitted on the record that they used these techniques to encourage Reza into confessing any involvement. We conclude these tactics did not stray into the realm of "improper."

confession in case number 2009-CF-635 (Milone and Sullivan offense charges). We affirm the trial court's denial of the motion to suppress in case number 2009-CF-726 (Lee offense charges).

Reversed and remanded for further proceedings consistent herewith.

LAGOA, J., concurs.

SCALES, J. concurring in part and dissenting in part.

I concur with that portion of the majority's opinion affirming the trial court's denial of Reza's motion to suppress in lower tribunal case number 2009-CF-726. I respectfully dissent, however, from that portion of the majority opinion reversing the trial court's denial of Reza's motion to suppress in lower tribunal case number 2009-CF-635.

While Reza's arrest was without probable cause, I agree with the trial court's conclusion[8] that intervening circumstances broke the causal chain between Reza's tainted arrest and Reza's confession so that Reza's confession should not be suppressed. Brown v. Illinois, 422 U.S. 590 (1975).

In determining whether the causal chain has been broken, a court must examine the connection between the tainted arrest and the confession. State v. Gifford, 558 So. 2d 444, 445-46 (Fla. 4th DCA 1990). In such an examination, the court considers "(1) the temporal proximity of the illegal arrest and statement; (2) the presence of intervening circumstances; (3) and the purpose and flagrancy of the official misconduct." Id. at 446.

The majority opinion concludes that "there was no intervening event of significance whatsoever" to break the causal chain. I view the post-arrest facts in a different light.

With regard to the temporal proximity of Reza's arrest and confession, the police officers who brought Reza to the police substation did not give Reza his

---

[8] On April 29, 2011, the trial court held an extensive evidentiary hearing on the motion to suppress Reza's confession in lower tribunal case number 2009-CF-635.

<u>Miranda</u> warnings and did not conduct an interrogation of Reza. In other words, no information was elicited from Reza proximate to the arrest.

At the police substation, a separate set of police officers, two detectives, dealt with Reza: they removed Reza's handcuffs and called his mother. Reza's mother then came to the police substation and joined her son in an interview room. Reza's mother encouraged Reza to cooperate with the police. Only after Reza's mother arrived and spoke with her son did the detectives provide Reza with his <u>Miranda</u> rights.[9]  In my view, these were the intervening circumstances that broke any causal connection between Reza's arrest and his confession. Thereafter, Reza voluntarily confessed to the muggings.

With regard to the purpose and flagrancy of official misconduct, while the police lacked probable cause to arrest Reza, the officers did not descend into flagrant misconduct. Their conduct was not motivated by malevolent intent; indeed, their suspicion that Reza was involved in the crime was reasonable. Reza was found in a secluded area with Cornelius Jones who had been identified as the prime suspect in the muggings. Reza's responses to simple questions were evasive.

It bears noting that, initially, the detectives considered Reza as a potential witness rather than a suspect, and their questioning reflected this view. The interview of Reza was not coercive.[10] Reza's decision to implicate himself came

_____

[9] As the majority points out, <u>Miranda</u> warnings alone are not sufficient to break the causal connection. <u>J.P. v. State</u>, 695 So. 2d 464, 466 (Fla. 3d DCA 1997).

[10] Unlike the confession suppressed in <u>Taylor v. Alabama</u>, 457 U.S. 687 (1982), Reza's confession was not the result of any police exploitation of Reza's illegal

after Reza consulted with his mother and after Reza received his <u>Miranda</u> warnings. In my view, Reza's confession arose from circumstances that turned away from any coercive influence of the arrest itself.

Based on the foregoing, I conclude that any taint from Reza's illegal arrest had dissipated prior to Reza's confession; therefore, the trial court was correct in not suppressing Reza's confession in case number 2009-CF-635. I would affirm.

---

arrest. No promises or threats were made to Reza by the police; rather, Reza's confession to police was an act of free will Reza exercised after the police called Reza's mother and after the police gave Reza the opportunity to speak to his mother.